**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| Hurdl Inc., | ) |
| | ) Case No. 20-12768 (SCC) |
| | ) |
| Debtor.[1] | ) |
| | ) |

**DECLARATION OF JOSEPH V. PEGNIA IN SUPPORT OF THE CHAPTER 11
PETITION AND FIRST DAY PLEADINGS AND PURSUANT TO LOCAL RULE 1007-2**

I, Joseph V. Pegnia, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true and correct to the best of my knowledge, information, and belief,

including the information included in the exhibits attached hereto:

1.       I am acting as the Chief Restructuring Officer ("CRO") of Hurdl Inc. in the above-

captioned chapter 11 case, as debtor and debtor in possession (the "Debtor" or the "Company").  I

have served as CRO to the Company since October 2020.

2.       As further described herein, B. Riley (as defined herein) was engaged by Hurdl Inc.

to act as its CRO and I was assigned to act as CRO on behalf of B. Riley.  B. Riley is a national

financial advisory firm that provides corporate finance, forensic accounting, litigation support, real

estate consulting, and financial advisory services in a variety of areas including financial

restructuring.  My experience providing consulting services to troubled companies, both inside

and outside of bankruptcy, as well as to their bondholders, banks, other secured and unsecured

creditors, official creditor committees, acquirers, equity sponsors, and other parties in interest, has

included raising capital and arranging financial transactions with lenders and creditors, developing

---

[1]  The last four digits of the Debtor's tax identification number are 9630.  The Debtor's address is 64 Bleecker
Street, Suite 111, New York, NY 10012.

capital structures that are supported by operating ability and asset mix, and analyzing the financial structure of a company to ensure that such structure is based on the future goals of management and other stakeholders. I have extensive experience in U.S. Bankruptcy Courts and Federal District Courts and have been involved in over 30 chapter 11 cases and multi-state federal receiverships and state court receiverships.

3.    As the Debtor's CRO, I am familiar with and knowledgeable of the Debtor's day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of this chapter 11 case (the "Chapter 11 Case"). I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the Chapter 11 Case and in support of the motions and applications that the Debtor filed with the Court, including the "first-day" pleadings filed concurrently herewith (the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtor.

4.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees and officers of the Debtor, my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial condition, or from my discussions with the Debtor's proposed legal counsel, Pack Law, P.A. ("Pack Law"). If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

## The Debtor's Business

5.    The Debtor is the pioneer in audience engagement, B2B consumer data capture, and communications technology for live events and post-show conversations. The Debtor's robust technology platform enables entertainers, global brands, and venue owners to interact with

2

audiences during live events. The Debtor's customers (i.e., entertainers and brands) subsequently utilize the Debtor's SMS messaging platform to engage the audience and create personalized engagement long after the relevant live event. The Debtor's innovative lighting control system invites attendees to interact during live events through a wristband, and then through data collection, and gathers key demographics and preferences through SMS surveys during and after the live event.

6.       Highlighting the power of the Debtor's audience activation and engagement platform, approximately 73% of the Company's lighted wristbands distributed at live events have been activated by the audience members. This unmatched activation rate as compared with the Debtor's competitors is a critical component of the Debtor's competitive advantage in assisting artists and brands to identify their audiences and customer bases, respectively.

7.       Prior to COVID-19, the Debtor's team had pioneered live event data capture and personalized SMS messaging. Since its inception, the Debtor raised almost $9 million of capital, through the issuance of equity, unsecured bonds, and secured debt. But, as with many startups, the Company required significant capital to break out and develop brand awareness, and has yet to turn a profit. The onset of COVID-19 catastrophically affected the Company's operations, as its main source of revenue—live events—were halted.

## The Debtor's Prepetition Corporate and Capital Structure

### I.       Corporate Structure.

8.       The Debtor is a privately held Delaware corporation headquartered in New York, New York. The Debtor's equity interests consist of a class of Series A-1 Preferred Stock, a class of Series A Preferred Stock, a class of Common Stock, and certain common stock options.

9.       The Board of Directors of Hurdl Inc. (the "Board") oversees the operation of the Debtor. Day-to-day responsibility is overseen by the Debtor's Chief Executive Officer. Prior to

commencing this Chapter 11 Case, the Debtor took measures to ensure a seamless transition into chapter 11 and provide for robust and independent corporate governance procedures, including the appointment of myself as the CRO.

## II.   Prepetition Capital Structure.

### A.   Overview.

10.    The Debtor's capital structure is relatively straightforward.  The Debtor's capital structure consists of secured debt, unsecured debt, and equity.  The Company's material debt consists of a first-lien, secured bank loan from Pinnacle Bank in the principal amount of $3,000,000 that matures on March 15, 2021, and a series of Bridge Loans issued in the aggregate amount of approximately $500,000 (which was funded through three separate issuances of unsecured notes at the end of March 2020, April 2020, and May 2020, respectively).  Each note issued as a Bridge Loan matures 24 months following the issuance of such Note.  Additionally, as described further below, the Debtor owes more than $1,200,000 to other general unsecured creditors.

### B.   The Pinnacle Bank Business Loan Agreement.

11.    On March 15, 2019, the Debtor and Pinnacle Bank executed that certain Business Loan Agreement.  To secure its indebtedness, Pinnacle Bank appropriately filed financing statements, granting Pinnacle Bank a first-priority security interest in, and liens on, substantially all of the Debtor's assets.  As a condition to issuing the Business Loan, contemporaneously with the Debtor's entry into the Business Loan Agreement, certain parties entered into that certain Guarantee Fee and Reimbursement Agreement, which among other things, (a) obligated the guarantors thereunder to severally guarantee the Debtor's financial obligations under the Business Loan Agreement, in an amount not to exceed $3,000,000, and (b) required each guarantor issue a secured promissory note to the Debtor within five (5) business days of receipt of written demand

4

by Pinnacle Bank with respect to the guarantee. As of the Petition Date, approximately $3,019,653.13 remains outstanding in respect of the Business Loan Agreement.

### C.     The Bridge Loan.

12.     In order to provide sufficient capital to continue operating the Debtor during the Sale Process (as defined and discussed herein), the Debtor secured commitments from various lenders in the amount of approximately $665,000, which would be funded through four installments (the "Bridge Loan"). Only three of the four installments were ultimately fulfilled, resulting in an unsecured debt raise of approximately $500,000, which remains outstanding as of the Petition Date.

### D.     Other Unsecured Debt.

13.     The Debtor owes approximately $1,200,000 in other general unsecured debt, including: trade debt and contract employee backpay.

### E.     Equity Interests.

14.     As described above, the Debtor's equity interests consist of a class of Series A-1 Preferred Stock, a class of Series A Preferred Stock, a class of Common Stock, and certain common stock options.

### F.     Additional Debts.

a.     *Two Bulls Debt:* In addition to the debts described above, the Debtor and Two Bulls LLC ("Two Bulls") are parties to a number of agreements and arrangements through which Two Bulls provides certain technology services that are critical to the Debtor's business. As of the Petition Date, the Debtor owes to Two Bulls an amount of no less than $123,100. Two Bulls and the Debtor believe that a material dispute had arisen regarding Two Bulls' rights and security interests in the Debtor's intellectual property and engaged in good faith settlement discussions regarding the Debtor's continued use of Two Bull's software services. In full settlement, and in exchange for full and final satisfaction, settlement, release, and discharge of all such disputes related thereto, Two Bulls and the Debtor agreed to a one-time payment of $46,644.21 plus a general unsecured, deficiency claim for the remaining amount,

conditioned upon the consummation of the Chapter 11 Case, which will also enable the continued use of Two Bull's software services.

b.  *The PPP Loan.*  To fund critical payments following the unsuccessful Sale Process, the Debtor obtained a Paycheck Protection Program loan (the "PPP Loan") from the U.S. Small Business Administration, delayed payments to non-critical account payable vendors, and reduced staff hours all of which extended the Debtor's runway, and together with the PPP loan, meant that the Debtor did not need to draw down on the fourth milestone of the Bridge Loan.  As of the Petition Date, the PPP Loan remains due and outstanding in the approximate amount of $59,945, but the Company believes it meets all requirements for loan forgiveness, which is expected to occur in the short term.

### III.   Proposed Transactions Pursuant to the Plan.

15.   As set forth in the Plan, the restructuring provides for a comprehensive restructuring of Claims against and Interests in the Debtor that will completely de-leverage the Debtor's capital structure, preserve the going-concern value of the Debtor's business, maximize recoveries available to all constituents, and provide for an equitable distribution to the Debtor's stakeholders. More specifically, the Restructuring Transactions provide, among other things, that:

a.  The DIP Lenders, including the Plan Sponsor, will provide the Debtor with $916,500.00 of new money as debtor-in-possession financing through the DIP Credit Facility, pursuant to the terms of the DIP Credit Agreement, which will be used, among other things, to satisfy certain outstanding debts and fund the Chapter 11 Case.

b.  In exchange for the DIP Loan provided to the Debtor, each DIP Lender on account of its Allowed DIP Loan Claim shall receive its Pro Rata share of 3.5% of the New Common Stock of the Reorganized Debtor, *provided, however*, that for the computation of Pro Rata issuance to such Holders, the Plan Sponsor's augmentation of the DIP Loan by $531,500, in accordance with Exhibit A to the RSA (the "Plan Sponsor DIP Loan"), shall not be included.  The Plan Sponsor, through the Plan Sponsor DIP Loan Claim shall separately receive 95% of the New Common Stock of the Reorganized Debtor.

c.  All Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired under the Bankruptcy Code.

d.  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each First Lien Claim, on the Effective Date, each Holder of an

Allowed First Lien Claim shall receive its Pro Rata share of cash in the amount of $300,000.00.

e.  Except to the extent that a Holder of an Allowed Bridge Loan Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Bridge Loan Claim, on the Effective Date, each Holder of an Allowed Bridge Loan Claim shall receive its Pro Rata Share of cash in the amount of $0.07 for each Dollar of its Allowed Bridge Loan Claim, plus its Pro Rata Share of 1.5% of the New Common Stock of the Reorganized Debtor.

f.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive either: (i) if Class 3 votes to accept the Plan or is presumed to have accepted the Plan, its Pro Rata Share of cash in the amount of $0.05 for each Dollar of its Allowed General Unsecured Claim, or (ii) if Class 3 votes to reject the Plan, no distribution under the Plan.

**IV.   Key Events Leading to the Chapter 11 Case.**

**G.   Liquidity Became Necessary as the Sale Process Failed and COVID Endured.**

16.   With a strained balance sheet but promising future, in February 2020, Hurdl engaged in raising equity financing to fund the Debtor's growth.  In March 2020, however, at the onset of the COVID-19 pandemic, the cancellation of live events across the industry shut down the Debtor's business.  The Debtor pivoted to marketing itself for sale (the "Sale Process"), and consulted with different investment bankers to facilitate the sale effort.  In April 2020, the Debtor engaged Menalto Advisors, LLC ("Menalto").  To provide Menalto sufficient time to run the Sale Process, the Board and Menalto agreed that interim funding was necessary.  The Company was able to secure commitments of approximately $665,000, which would be funded through four installments.  Only three of the four installments were ultimately called, resulting in an unsecured debt raise of approximately $500,000, which remains outstanding as of the Petition Date (the "Bridge Loan Claims").

17.     The Sale Process proved unsuccessful, and as summer progressed, it was clear that relief for live events due to the pandemic was not in sight.  To fund critical payments, the Debtor obtained the PPP Loan, delayed payments to non-critical vendors, and reduced staff hours, all of which extended the Debtor's liquidity runway, and together with the PPP loan, meant that the Debtor did not need to draw down on the fourth milestone of the Bridge Loan.

18.     As COVID restrictions continued through summer, in combination with the severe limitations on the Debtor's liquidity, the failed Sale Process, and with significant debts soon coming due, including significant interest payments due to Pinnacle Bank, the Debtor engaged Pack Law on or around August 27, 2020 to begin exploring restructuring options. Pack Law immediately began working with the Debtor's management and the Board to develop a strategy to further the best interests of the Company and its various creditors.  This involved, among other things, preliminary negotiations and discussions with the Debtor's largest lenders, including Pinnacle Bank, and other interested parties and potential investors.

19.     The negotiations and discussions regarding a consensual chapter 11 process ultimately thwarted potential foreclosure efforts that could have potentially been instituted by Pinnacle Bank, the guarantors of that debt, and/or a combination of both, and paved the way for the global, consensual resolution of the Debtor's debts as set forth in the Plan.

20.     As negotiations continued, it became clear that a consensual chapter 11 restructuring was possible.  Therefore, on or about October 5, 2020, the Debtor engaged GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley") to act as its CRO.  Pursuant to the engagement letter with B. Riley, I, Joseph V. Pegnia, have acted as CRO and assisted the company in reviewing its strategic options, developing its financial

projections and liquidity projections, and generally assisted the company in preparing for a potential restructuring pursuant to chapter 11 of the Bankruptcy Code or otherwise.

### H.      Entry into the Restructuring Support Agreement.

21.      In light of Pinnacle Bank's $3 million debt, which was, and is, secured by substantially all assets of the Debtor, the Debtor, in September 2020, engaged with Pinnacle Bank to determine whether it would, in light of the guarantees supporting its loan, support a restructuring instead of foreclosing against all assets of the Debtor.  With Pinnacle Bank's support, on or about October 16, 2020, the Debtor circulated a proposed Restructuring Support Agreement to Pinnacle Bank, the various lenders under the Bridge Loan, and various potential supporting investors.  That Restructuring Support Agreement was ultimately not signed by all the necessary parties, but served as the blueprint for how the Debtor could ultimately restructure through Chapter 11.

22.      After hard-fought negotiations with parties in interest, on November 12, 2020, the Debtor circulated an *Amended and Restated Restructuring Support Agreement* (the "RSA") to Pinnacle Bank, the various lenders under the Bridge Loan, and the various potential supporting investors.  The RSA was executed on November 17, 2020.  The non-Debtor parties to the RSA agreed to, among other things, vote in favor of the Plan, not opt out of the various third party releases contained in the Plan, and support the implementation and consummation of the Plan. Further, Pinnacle Bank agreed to forebear enforcement of the Business Loan Agreement for the Forbearance Period, which expires on January 29, 2020, and agreed not to transfer any of the Claims it held or holds against the Debtor.

23.      The parties to the RSA represent Holders of 100% in amount and number of First Lien Claims and Holders of approximately 85% in amount and 81% number, respectively of non-insider Holders of Bridge Loan Claims.

## I.      Funding the Plan.

24.      While negotiating the terms of the RSA, certain of the Debtor's investors agreed to provide first-lien, secured debtor in possession financing.  These investors are the Supporting Investors and include the Plan Sponsor.  Accordingly, on November 12, 2020, the Debtor circulated an *Amended and Restated Debtor-In-Possession Credit and Security Agreement* (the "DIP Credit Agreement").  The DIP Credit Agreement was executed by the relevant parties on November 17, 2020.  Each party to the DIP Credit Agreement also executed the RSA.  Under the DIP Credit Agreement, the non-Debtor parties agreed to, among other things, provide debtor-in-possession financing in an amount up to a Maximum Commitment of $916,500.  Through the DIP Credit Agreement, the Plan Sponsor agreed to invest $531,500 (to supplement certain of the DIP Obligations), which investment would be used to fund the Debtor's operations during the Chapter 11 Case, creditor recoveries, and operations for the Reorganized Debtor to ensure the Debtor could consummate a feasible plan.  The DIP Lenders other than the Plan Sponsor have unanimously agreed to the issuance of 95% of the Equity to the Plan Sponsor on account of his Plan Sponsor DIP Loan, and Pinnacle Bank consensually agreed to be primed by the DIP Loans, so long as certain conditions are met.  These conditions include the requirement that certain payments be made as specified in the RSA (as a partial payment of the principal directly to Pinnacle Bank, and a partial payment of interest obligations in the form of adequate protection), and consummation of the Plan on or before January 29, 2021.

### The Debtor's First Day Pleadings

25.      The First Day Pleadings seek relief to allow the Debtor to meet necessary obligations and fulfill its duties as a debtor in possession.  I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to

enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value and best serves the Debtor's estate and creditors' interests. The facts set forth in each First Day Pleading are incorporated herein by reference. The First Day Pleadings include the following:

a.  *Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Authorizing the Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105(A), 362 and 364(c) and (d), Granting Super Priority Claims to the DIP Lenders Pursuant to 11 U.S.C. 364(c), (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Dkt. No. 2];

b.  *Debtor's Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Extending the Deadline to File SOFAs, And (VI) Granting Related Relief* [Dkt. No. 3];

c.  *Debtor's Motion for Entry of an Order (A) Authorizing the Debtor To (I) Pay Prepetition Employee Wages, Salaries and Other Compensation, and (II) Continue Employee Benefits Programs, and (B) Granting Related Relief* [Dkt. No. 4];

d.  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Operate its Cash Management System, Honor Certain Prepetition Obligations Related Thereto, and Maintain Existing Business Forms, and (II) Granting Related Relief* [Dkt. No. 5]; and

e.  *Debtor's Motion Pursuant to 11 U.S.C. § 502(b)(9), Fed. R. Bankr. P. 2002 and 3003(c)(3), and Local Rule 3003-1 for Entry of an Order (I) Establishing Deadline to File Proofs of Claim and Procedures Relating Thereto and (II) Approving Form and Manner of Notice Thereof* [Dkt. No. 6].

26.     The First Day Pleadings seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefit obligations, ensure the continuation of the Debtor's cash management system, and maintain other operations in the ordinary course of business. Importantly, the First Day Pleadings include relief for a fast-tracked case, which is critical, given how tight budgeting is and how constrained liquidity remains for the Debtor. I

believe all relief sought in the First Day Pleadings is critical to the continued success of the Debtor during this Chapter 11 Case and ultimately, of benefit to all stakeholders.

27.     Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtor.   I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtor has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate.   The Debtor will defer seeking other relief to subsequent hearings before the Court.

*[Remainder of page intentionally left blank.]*

28.    The above describes the Debtor's business and capital structure, the factors that precipitated the commencement of this Chapter 11 Case, and the critical need for the Debtor to obtain the relief sought in the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 30, 2020
        New York, NY


By: _/s/ Joseph V. Pegnia_____
Name: Joseph V. Pegnia
Title: Chief Restructuring Officer

## Exhibit A

**List of the Holders of the Debtor's 20 Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of the Debtor's creditors holding the 20 largest unsecured claims.  Claims held by "insiders" as defined in section 101(31) of the Bankruptcy Code are excluded.

| Name | Contact and Address[2] | Phone Number | Email Address | Amount of Claim | Contingent, Unliquidated, or Disputed? |
|---|---|---|---|---|---|
| Endeavor | Merrill Mladineo, 9601 Wilshire Blvd., Beverly Hills, CA 90210 | (917) 239-2547 | Merrill.Mladineo@img.com | $270,000.00 | |
| Well Group Products | Jeffrey Hansen, 1101 Little School Road Arlington, TX 76017 | (817) 429-0956 | jeff@hansenattorneys.com | $182,162.81 | |
| Enabling Founders LLC | Randy Ramusack, 33 Century Blvd, Suite 766, Millerton, NY 12546 | (917) 816-3192 | randy@enablingfounders.com | $125,000.00 | |
| Perkins Coie | Jeff Silberman, 1155 Avenue of the Americas, 22nd Floor, New York, NY 10036-2711 | (515) 668-6217 | JSilberman@perkinscoie.com | $81,680.50 | |
| T. Powell Hedley | PO Box 331133, Nashville, TN 37203 | (646) 223-0342 | powell@hedleyentertainment.com | $81,098.64 | |
| Benny Brown | 5917 Manchester Highway, Morrison, TN 37357 | (646) 223-0342 | bbr.benny@att.net | $80,433.30 | |
| Barlow Capital, LLC | Austin Pennington, 1804 Williamson | (615) 642-7646 | austinpennington@gmail.com | $76,693.15 | |

---

[2] For creditors who are individuals, the contact name is the name of the creditor.

| Name | Contact and Address[2] | Phone Number | Email Address | Amount of Claim | Contingent, Unliquidated, or Disputed? |
|------|----------------------|--------------|---------------|-----------------|------------------------------------------|
| | Court, #107, Brentwood, TN 37027 | | | | |
| Thomas Kendrot | 413 Ellendale Avenue, Franklin, TN 37205 | (917) 547-6053 | TKendrot@swhealth.com | $76,657.53 | |
| Nemean Advisory, LLC | Lisa Schering, 102 W 71 Street, Apt 2A, New York, NY 10023 | (216) 534-7667 | lisa.Scheiring@gmail.com | $62,500.00 | Disputed |
| U.S. Small Business Administration | Paycheck Protection Program, 409 3rd St, SW. Washington DC 20416 | (800) 827-5722 | answerdesk@sba.gov | $59,945.00 | |
| Ho Made Media | Pete Ho 185 Hall Street, Apt. 1609, Brooklyn, NY 11205 | (917) 771-5358 | pete@petemiser.com | $50,000.00 | |
| Bradley Arant Boult Cummings | John Titus, 1600 Division Street, Suite 700, Nashville, TN 37203 | (615) 496-7483 | jtitus@bradley.com | $45,078.91 | |
| Bart Family, LLC | David Bartholomew, 421 Ellendale Avenue, Nashville, TN 37208 | (615) 364-3635 | dbartholomew@swhealth.com | $38,328.77 | |
| Michael Tudeen | 9425 Weatherly Drive, Brentwood, TN 37027 | (615) 804-9687 | mike.tudeen@gmail.com | $37,600.55 | |
| Span Digital, LLC | Finance Dept., 333 Bryant Street, Suite 110, San Francisco, CA 94107 | (415) 377-7659 | finance@spandigital.com | $36,000.00 | |
| Brendan Justice | 1433 72nd Street, Apt 5, Brooklyn, NY 11228 | (646) 626-2429 | brendanjustice@gmail.com | $20,000.00 | |

| Name | Contact and Address[2] | Phone Number | Email Address | Amount of Claim | Contingent, Unliquidated, or Disputed? |
|------|------------------------|--------------|---------------|-----------------|------------------------------------------|
| Faulkner Mackie | Ward Austin 3100 West End Avenue, Suite 700, Nashville, TN 37203 | (615) 292-3011 | waustin@fmccpa.com | $18,930.00 | |
| Baker Donelson | Mark Baugh, 211 Commerce Street, Suite 800, Nashville, TN 37201 | (615) 726-5614 | mbaugh@bakerdonelson.com | $16,546.00 | |
| Edward G. Grindstaff, Sr. | 6210 Belle Rive Drive, Brentwood, TN 37027 | (615) 330-9597 | douglasgrind1@gmail.com | $15,221.36 | |
| Twilio Inc. | Doug Patel, 375 Beale St., Suite 300, San Francisco, CA 94105 | (844) 814-4627 | dopatel@twilio.com | $13,130.06 | |

### Exhibit B

**List of the Holders of the Debtor's Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of the Debtor's creditors holding the largest secured claims.

| Name | Contact and Address | Phone Number | Email Address | Amount of Claim | Contingent, Unliquidated, or Disputed? |
|---|---|---|---|---|---|
| Pinnacle Bank | Scott Hatcher, 150 Third Ave. S., Suite 900, Nashville, TN 37201 | (615) 744-3700 | scott.hatcher@pnfp.com | $3,019,653.13 | |
| Two Bulls LLC | Noah Harlan, 55 Washington St., Suite 260, Brooklyn, NY 11201 | (347) 837 6141 | noah@twobulls.com | $123,100.00 | |

## Exhibit C

**Summary of the Debtor's Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtor's total assets and liabilities.  The following data comports with the Official Form 206Sum and is based on the latest available information.

| Total Assets and Liabilities | Amount |
|---|---|
| Total Assets (as more fully set forth in the Debtor's Schedules) | Approximately $484,613 |
| Total Liabilities (as more fully set forth in the Debtor's Schedules) | Approximately $4,877,677 |

## **Exhibit D**

### **Summary of the Debtor's Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following describes the Debtor's property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity:

- Certain property of the Debtor, consisting primarily of electronic wristbands, is in the possession of Storage Post at 181-203 Broadway, Jersey City, NJ 07306. To the best of the Debtor's knowledge, Storage Post is not a creditor.

**<u>Exhibit E</u>**

**Summary of the Debtor's Property from Which the Debtor Operates Its Business**

     Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtor operates its business as of the Petition Date.  The Debtor operates its business from its leased location at 64 Bleecker St., Suite 111, New York, NY 10012.

## <u>Exhibit F</u>

**Location of the Debtor's Substantial Assets, Books and Records, and Nature and Location of the Debtor's Assets Outside the United States**

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtor's substantial assets and books and records. As of the Petition Date, the Debtor does not hold assets outside the territorial limits of the United States.  The Debtor's primary assets are intellectual property without a physical location, however the holder of the first priority lien on such intellectual property is located in Brooklyn, New York.  The Debtor maintains its books and records electronically.

## Exhibit G

### The Debtor's Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their responsibilities and relevant experience as of the Petition Date:

- Randall Ramusack has served as the Debtor's Chief Executive Officer since August 2018. He has significant experience in the industry, including time spent as Executive Director, Urban Technology at Verizon and serving as Engineering Director and CTO-Europe at Microsoft.
- Tim Snyder has served as the Debtor's Chief Technology Officer since January 2019. His experience includes time spent as Product Manager with Verizon and Product Manager for Data Warehouse at Thermo Fisher Scientific.
- Bill Carson has served as the Debtor's Chief Financial Officer since September 2019. His experience includes time spent as Chief Financial Officer at Crystal Computing and Head of Mergers and Acquisitions at Citigroup.

**Exhibit H**

**Additional Information if Business is to Continue**

Pursuant to Local Rule 1007-2(b), the following provides certain additional information regarding weekly payroll to employees and amounts proposed to be paid for services of the Debtor's officers, stockholders and directors. The estimated weekly payroll after the filing of the chapter 11 petition, excluding officers and other insiders, is $3,000.00. The estimated amounts to be paid for services to the Debtor's officers, stockholders, and directors is $1,000.00 on a weekly basis. Additionally, the cash flow forecast provided on the following page serve as a schedule, for the period following the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and other information relevant to understanding the foregoing, in accordance with Local Rule 1007-2(b)(3).

| | 29Nov20 | 6Dec20 | 13Dec20 | 20Dec20 | 27Dec20 | 3Jan21 | 10Jan21 | 17Jan21 | 24Jan21 | 31Jan21 | 7Feb21 | 14Feb21 | 21Feb21 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending Date** | | | | | | | | | | | | | | |
| **Hurdl Weekly Cash Flow Forecast** | | | | | | | | | | | | | | |
| Cash Beginning Balance | $ 11,212.84 | $ 420,895.97 | $ 411,062.12 | $ 406,952.51 | $ 861,813.58 | $ 856,947.77 | $ 848,089.83 | $ 843,874.00 | $ 829,358.86 | $ 825,286.53 | $ 815,639.30 | $ 811,598.93 | $ 805,287.12 | $ 11,212.84 |
| Non-Operating Chapter 11 Expenses | 1,717.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8,283.00 | 0.00 | 0.00 | 0.00 | 0.00 | 35,000.00 | 45,000.00 |
| **Operating Expenses:** | | | | | | | | | | | | | | |
| Payroll | 5,763.53 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 3,753.75 | 50,808.53 |
| Payroll catch up amount | 38,000.76 | | | | | | | | | | | | | 38,000.76 |
| Interest Expense (Pinnacle) | | 5,000.00 | | | | 5,000.00 | | | | 5,000.00 | | | | 15,000.00 |
| Insurance - D&O+Excess | | | | 1,334.53 | | | | 1,334.53 | | | | 1,334.53 | | 4,003.59 |
| Insurance - Gen Liab+Workers Comp | | | | 943.88 | | | | 943.88 | | | | 943.88 | | 2,831.64 |
| Insurance - Health (Sherry Byrge Only) | | 793.48 | | | 793.48 | | | | | 793.48 | | | 793.48 | 3,173.92 |
| AMEX (Travel, Software, IT): | | | | | | | | | | | | | | - |
| Travel/Move | | | | | | | | | | | | | | - |
| Heroku | | | 179.65 | | | | 179.65 | | | | | 179.65 | | 538.95 |
| Storage Unit | 218.58 | | | | 218.58 | | | | 218.58 | | | | | 655.74 |
| Quickbooks | | | 76.21 | | | | | 76.21 | | | | | | 152.42 |
| Slack | | | | 8.78 | | | | 8.78 | | | | | | 17.56 |
| Zoom | | | | 14.99 | | | | 14.99 | | | | | | 29.98 |
| Google Gsuite | | 170.43 | | | | | 170.43 | | | | 170.43 | | | 511.29 |
| Amazon Web (AWS) | | 4.19 | | | | 4.19 | | | | | 4.19 | | | 12.57 |
| Github | | 12.00 | | | | | 12.00 | | | | 12.00 | | | 36.00 |
| Flywheel Web Hosting Service | | | | | | | | | | | | | | - |
| Adobe Sign | | | | | | | | | | | | | | - |
| Termly (website legal policies) | | | | | | | | | | | | | | - |
| Name Cheap Domain | | | | | | | | | | | | | | - |
| Contingency | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 1,300.00 |
| NYS Tax Payment | | | | | | | | | | | | | | - |
| **Total Operating Expenses** | 44,082.87 | 9,833.85 | 4,109.61 | 6,155.93 | 4,865.81 | 8,857.94 | 4,215.83 | 6,232.14 | 4,072.33 | 9,647.23 | 4,040.37 | 6,311.81 | 4,647.23 | $ 117,072.95 |
| **Tax & Accounting** | | | | | | | | | | | | | | - |
| **Total Disbursements** | 45,799.87 | 9,833.85 | 4,109.61 | 6,155.93 | 4,865.81 | 8,857.94 | 4,215.83 | 14,515.14 | 4,072.33 | 9,647.23 | 4,040.37 | 6,311.81 | 39,647.23 | $ 162,072.95 |
| DIP Loan proceeds | 455,483.00 | | | 461,017.00 | | | | | | | | | | $ 916,500.00 |
| **Cash Ending Balance** | $ 420,895.97 | $ 411,062.12 | $ 406,952.51 | $ 861,813.58 | $ 856,947.77 | $ 848,089.83 | $ 843,874.00 | $ 829,358.86 | $ 825,286.53 | $ 815,639.30 | $ 811,598.93 | $ 805,287.12 | $ 765,639.89 | $ 765,639.89 |